**JACK FAUCETT ASSOCIATES, INC.,
et al.**

v.

**AMERICAN TELEPHONE AND TELE-
GRAPH CO., et al., Appellants.**

No. 83–1735.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 13, 1984.

Decided Sept. 11, 1984.

George L. Saunders, Jr., Chicago, Ill., with whom Michael S. Yauch, Stewart A. Block, Ronald S. Flagg, Howard J. Trienens and Raymond Brenner, Washington, D.C., were on the brief, for appellants.

William Simon, with whom Alan M. Wiseman, Albert O. Cornelison, Jr., Jerry S. Cohen and Michael D. Hausfeld, Washington, D.C., were on the brief, for appellees. Robert G. Abrams, Washington, D.C., also entered an appearance for appellees.

Before TAMM, MIKVA and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

We confront today several difficult issues concerning the applicability of offensive collateral estoppel or issue preclusion. The district court invoked offensive estoppel to estop American Telephone and Telegraph Co. (AT & T) from litigating its liability on certain alleged antitrust violations. We review this decision against a background in which some of the concerns normally associated with issue preclusion are heightened. The desire for judicial economy rings loudly since without issue preclusion, a long and difficult trial may ensue. Yet, notions of fairness are also heightened since crucial evidence was erroneously omitted from the prior case and since factors external to that case militate against the use of offensive estoppel.

We conclude that the district court abused its discretion in allowing the plaintiffs to utilize offensive estoppel to preclude any questions concerning the defendants' liability. On the record established and the reasons articulated by the district

court, the application of offensive collateral estoppel fell below the minimum safeguards which must be present ere a party can be denied the right to present all of its defenses. Accordingly, we reverse and remand.

## I. BACKGROUND

The underlying cause of action in the consolidated cases under review is a class action antitrust suit brought against AT & T and its several operating companies throughout the United States (collectively AT & T). Plaintiffs are seven businesses that, from 1968 through 1978, were required, as a condition to obtaining access to AT & T's network, to acquire interface devices from AT & T so as to connect customer-provided terminal equipment to the AT & T network.

The interface devices, a common type of which was the "protective connecting arrangement" (PCA), attached to the customer-provided telephone terminal equipment. Broadly speaking, business terminal equipment encompasses two distinct categories. "Key systems" allow a single telephone to connect several other telephones through the use of buttons on the telephones. "Private business exchanges" (PBX) utilize a central console or switchboard to allow the interconnection of numerous lines. See Litton Systems, Inc. v. AT & T, 700 F.2d 785, 791 (2d Cir.1983), cert. denied, — U.S. ——, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984). Other items of terminal equipment include residential phones, answering devices, dialers, and computer terminals. See North Carolina Utilities Commission v. FCC, 552 F.2d 1036, 1040 (4th Cir.), cert. denied, 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977).

Plaintiffs represent a class of "all users of telephone terminal equipment who received bills from and made payments to any Bell system company for the installation or rental of interface devices between November 20, 1970 and July 1, 1978." Larkin General Hospital, Ltd. v. AT & T, Memorandum and Order at 3 n. 1 (D.D.C. June 21, 1983). 566 F.Supp. 296, 298.

Plaintiffs allege that the interface device requirement, which AT & T imposed by a tariff filed with the Federal Communications Commission (FCC), violated the Sherman Act, Sections 1 and 2, 15 U.S.C. §§ 1, 2. Plaintiffs allege that by requiring interface devices, AT & T intended to, and did obtain and perpetuate a monopoly in terminal equipment.

### A. Regulatory Background.

The history of the interface device is lengthy, detailed, and controversial. See generally Litton Systems, Inc. v. AT & T, 700 F.2d 785 (2nd Cir.1983), cert. denied, — U.S. ——, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984); United States v. AT & T, 524 F.Supp. 1336 (D.D.C.1981). For our discussion of issue preclusion, however, a broad framework suffices.

Prior to 1956, AT & T, through a tariff filed with the FCC, prohibited the attachment of all foreign devices to its telephone network. AT & T justified this prohibition as necessary to ensure the safe and effective operation of the national telephone network. Using the same rationale of operational concerns, the FCC, in 1955, prohibited the use of a sound shield that attached to a telephone's mouthpiece. Hush-A-Phone Corp., 20 F.C.C. 391 (1955). Indicating that actual harm to the network was to be the guiding principle, this court voided that FCC decision, finding the Hush-A-Phone ruling to be neither just nor reasonable. Hush-A-Phone Corp. v. United States, 238 F.2d 266 (D.C.Cir.1956). This case represented the initial erosion of AT & T's absolute bar against foreign attachments. In Use of the Carterphone Device in Message Toll Telephone Service, 13 F.C.C.2d 420, reconsideration denied, 14 F.C.C.2d 571 (1968), the FCC, applied the Hush-A-Phone rationale and declared unlawful the existing foreign attachment prohibition and ordered AT & T to file new tariffs.

In response to Carterphone, AT & T filed the so-called interface tariffs that are a focus of this litigation. In broad terms, the tariffs permitted the attachment of foreign devices to the telephone network so

long as any electrical connections were through a PCA or other interface device provided by AT & T or its subsidiaries. The FCC permitted the tariffs to become effective, but did so without "giving any specific approval to the revised tariffs." *AT & T "Foreign Attachment" Tariff Revisions*, 15 F.C.C.2d 605, 610 (1968). For several years thereafter, the necessity of requiring the interface device was studied. In 1969, for example, the FCC convened a panel of the National Academy of Sciences to study the problem. And in May 1971, the FCC formed a "PBX Advisory Committee" to study the feasibility of connections to the network without the interface device. State regulatory commissions also investigated AT & T's interface tariffs. *See, e.g., New York Telephone Co.*, 79 P.U. R.3d 410, 417 (N.Y. Pub. Serv. Comm'n 1969); *Glusing v. C & P Telephone Co.*, 1974 Md. P.S.C. 377 (Md.Pub.Serv. Comm'n).

In 1972, the FCC instituted rulemaking proceedings to address the interconnection issues. During the proceedings the PBX Committee submitted a report that included a model certification program. Under a certification program, terminal equipment that met certain standards could connect to the AT & T network without any interface device. AT & T, whether motivated by a genuine desire to protect its network or by a desire to protect its alleged monopoly, opposed the certification standard by filing comments with the Commission and, allegedly, by taking other steps in opposition. Despite this opposition, the FCC, in late 1975, adopted regulations establishing certification standards. *Proposals for New or Revised Classes of Interstate and Foreign Message Toll Telephone Service (MTS) and Wide Area Telephone Service (WATS)*, 56 F.C.C.2d 593, 599–613 (1975). Subsequently, the FCC applied its certification regulations to customer-provided terminal equipment. 58 F.C.C.2d 736 (1976). The Commission's order was affirmed on appeal. *North Carolina Utilities Commission v. FCC*, 552 F.2d 1036 (4th Cir.), *cert. denied*, 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977).

### B. *Other Cases.*

The case *sub judice* does not represent the first time that the courts have had to address these facts. Of special importance to our offensive estoppel analysis are two earlier cases, *United States v. AT & T*, 524 F.Supp. 1336 (D.D.C.1981) (Greene, Harold, J.) (the government's case), and subsequently, *Litton Systems, Inc. v. AT & T*, 700 F.2d 785 (2d Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984). We turn to these cases first.

### 1. *The government case.*

In 1979, the United States filed an antitrust action against AT & T, Western Electric Company, and Bell Telephone Laboratories. The government alleged that AT & T, through a variety of actions including the interface device requirement, had violated the Sherman Act. *See generally Southern Pacific Communications Co. v. AT & T*, 740 F.2d 1011, 1016–1017, (D.C. Cir.1984) (reviewing government action). While the case ultimately concluded by a settlement agreement between the government and AT & T, the rulings and record developed prior to that settlement were fully litigated and are highly relevant here. At the close of the government's case-in-chief, the defendants filed a motion to dismiss. Considering only the evidence adduced by the government, the district court, per Judge Harold Greene, largely denied the defendants' motion. *United States v. AT & T*, 524 F.Supp. 1336 (D.D.C. 1981). The court noted that a decision on a motion to dismiss "is a 'tentative and inclusive ruling on the quantum of plaintiff's proof,' which does not preclude a court from making findings and conclusions at the close of the case that are inconsistent with its prior tentative ruling." *Id.* at 1343. In denying the defendants' motion, however, the court articulated certain conclusions highly relevant to our discussion today.

The government's allegations there concerned, at least in part, the same intercon-

nection policies that are the subject of this case. In addressing those allegations, the court concluded:

> [T]he evidence [submitted by the government] sustains the allegation that defendants have used their local exchange monopolies to foreclose competition in the terminal equipment market by refusing unreasonably to interconnect equipment not provided by the Bell System, or by unreasonably impeding such interconnection, and that neither the government's interconnection claim nor the subsidiary contentions relating thereto should be dismissed.

524 F.Supp. at 1352. Yet the court also concluded that certain evidence introduced by the government could not be used to establish antitrust liability. Said the court:

> [T]he government also sought to prove that when the FCC finally did adopt a registration program in 1975 ... defendants ... filed extensive recommendations for the relaxation of the technical standards which they themselves had originally proposed to the FCC .... However, *since this proof directly concerns the positions taken by defendants before the FCC, the Court may not rely upon it as a basis for antitrust liability. See* Part VII, *infra.*

*Id.* at 1350 n. 54 (emphasis added). "Part VII," referenced in the above quote, addressed the reach and affect of the *Noerr-Pennington* doctrine on AT & T's alleged liability.

■ Under the *Noerr-Pennington* doctrine, the Sherman Act does not reach, in broad terms, "a concerted effort to influence public officials regardless of intent or purpose .... Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal either standing alone or as part of a broader scheme itself violative of the Sherman Act." *United Mine Workers v. Pennington,* 381 U.S. 657, 670, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626 (1965); *see also Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 138, 81

S.Ct. 523, 530, 5 L.Ed.2d 464 (1961). Liability can attach, however, when a party's government-related activities fall within the sham exception to the *Noerr-Pennington* doctrine. *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) (explaining sham exception to the *Noerr-Pennington* doctrine); *Federal Prescription Service Inc. v. American Pharmaceutical Association,* 663 F.2d 253 (D.C. Cir.1981) (same), *cert. denied,* 455 U.S. 928, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1982).

In applying the *Noerr-Pennington* doctrine, Judge Greene concluded:

> Upon examination of the evidence adduced by the government ..., the Court holds that, with but one exception, all of the AT & T's "petitioning" activities [110] which defendants claim are to be protected by *Noerr-Pennington* are, in fact, protected by that doctrine.

---

110. Defendants may have tangentially raised the *Noerr-Pennington* defense also with respect to matters which are conceptually wholly outside the scope of the doctrine. The Court's ruling herein therefore does not apply to AT & T's failure to propose a certification program for customer-provided equipment, for such conduct cannot conceivably be construed as petitioning for governmental action. (Of course, evidence of AT & T's position before the FCC in its certification docket no. 19528 does fall within the doctrine ....) Likewise, the government is not precluded from using AT & T's participation in various regulatory proceedings to show that defendants were aware of the facts they stated in such proceedings, any inconsistency with positions taken elsewhere, the possible lack of a basis for positions taken elsewhere (e.g. in negotiations with competitors), or the conduct of defendants following or in response to agency or court decision.

524 F.Supp. at 1363 & n. 110. The only incident that the court found to be within the sham exception involved a competitor's attempt to construct a nationwide digital network. The court, however, did not strike any specific government contentions under *Noerr-Pennington,* but invited the defendants to submit a list of government contentions to be stricken. 524 F.Supp. at 1364 n. 117. Because of the subsequent settlement, the court never ruled on any specific list. *See generally United States*

*v. AT & T Co.*, 552 F.Supp. 131 (D.D.C. 1982), *aff'd summarily sub. nom. Maryland v. United States*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983).

### 2. *Litton Systems, Inc. v. AT & T.*

The second decision upon which we focus is *Litton Systems, Inc. v. AT & T*, 700 F.2d 785 (2d Cir.1983). In June 1976, Litton Systems and some of its subsidiaries (collectively referred to as Litton) brought an antitrust action in the United States District Court for the Southern District of New York against AT & T, Western Electric Company, Bell Telephone Laboratories, and several Bell operating companies. Litton, suing as both competitor and customer, alleged that AT & T had monopolized and attempted to monopolize the telephone terminal equipment market by requiring the use of the interface device and by opposing the certification program that would have abolished that requirement.

The *Litton* litigation was lengthy and complex. Pretrial proceedings consumed over four years. Trial began in 1980, ran for more than five months and generated 18,000 pages of testimony and 945 exhibits. The jury ultimately found for Litton, concluding that, *inter alia*, AT & T had filed the interface tariff in bad faith, had intentionally delayed in providing and installing the interface devices, and had opposed certification in bad faith. *See* Special Interrogatories 6a, 6b, and 6c, *infra*, Appendix I. The jury awarded damages in the sum of $92,258,243, before trebling.

On appeal, the Second Circuit affirmed. 700 F.2d 785 (2d Cir.1983). (By this time, Judge Greene's decision on AT & T's motion to dismiss had issued.) The Second Circuit discussed many issues relevant to the instant case. Significantly, the court, two judges concurring, held that AT & T's actions were not within the ambit of the *Noerr-Pennington* doctrine. *Id.* at 806–09. This conclusion, the court indicated, was required because AT & T was " 'engaged in private commercial activity, no element of which involved seeking to procure the passage or enforcement of laws.' The decision to impose and maintain the interface tariff

was made in the AT & T boardroom, not at the FCC...." *Id.* at 807. The court thus concluded that AT & T's opposition to certification "embraced much more than merely advocating a position before the FCC." *Id.* at 809. Alternatively, the court, all three judges concurring, held that if *Noerr-Pennington* were applicable, liability attached since AT & T's actions were within the sham exception.

Also relevant to the case *sub judice* was *Litton*'s conclusion that the trial court erred in excluding a 1969 New York State Public Service Commission decision that approved the interface requirement as a reasonable means of protecting the AT & T network from harm.

> We view this evidence as arguably probative of AT & T's position, and find it difficult to justify the exclusion of [the New York State Public Service Commission] decision in light of the admission of the various FCC rulings.

700 F.2d at 819. The court, however, held that in light of the "complicated and extensive trial" the error was harmless. *Id.*

### C. *The proceedings in the district court.*

Plaintiffs in the instant case allege that AT & T violated the antitrust laws through its interface device policies, including its filing of the tariff and its opposition to certification. This appeal arises from plaintiffs' motion for the offensive application of issue preclusion. Plaintiffs sought to estop defendants from relitigating certain issues supposedly determined in *Litton*. In a brief ten page memorandum, the district court granted plaintiffs' motion in its entirety and thus found:

1. That the class plaintiffs have standing to sue for damages as customers of defendants.

2. That the relevant product market is the sale and lease of telephone terminal equipment consisting of PBX systems and key telephone systems.

3. That AT & T possessed monopoly power in the relevant market during the period in question.

4. That AT & T had the specific intent to obtain monopoly power in the relevant market during that period.

5. That there was a dangerous probability that AT & T would obtain monopoly power in that relevant market.

6. That AT & T attempted to and did willfully obtain and maintain its monopoly power in the relevant market by anticompetitive or predatory conduct, viz, filing its tariff requiring an interface device in bad faith; opposing certification of telephone terminal equipment in bad faith; and intentionally delaying the provision and installation of interface devices.

7. That AT & T's conduct aforesaid proximately caused injury and damage to the class plaintiffs herein.

8. That the interface device was not necessary to protect AT & T's telephone network from harm, and that any claim to the contrary is baseless.

9. That the *Noerr-Pennington* doctrine is not a defense to the claims of the class plaintiffs herein.

*Larkin General Hospital, Ltd. v. AT & T,* 566 F.Supp. 296, 301 (D.D.C.1983). This appeal followed.

Subsequent to the district court's action, several other district courts passed on the same or similar issue. *See, e.g., Phonetele, Inc. v. AT & T,* No. CV–74–3566–MML, 1984–1 Trade Cas. (CCH) ¶ 65,921 (C.D.Cal. January 19, 1984) (denying motion for offensive estoppel); *Wrede v. AT & T,* CA No. 83–283–1–MAC (M.D.Ga. May 30, 1984) (denying estoppel on several issues, including the *Noerr-Pennington* defense); *Selecton, Inc. v. AT & T,* 587 F.Supp. 856 (D.Ore.1984) (allowing offensive estoppel on some issues, including *Noerr-Pennington,* denying offensive estoppel on other issues, including *Litton*'s finding that AT & T had delayed intentionally in providing and installing interface devices, and *Litton*'s findings of standing, injury in fact, and proximate cause). *See also AM/Comm Systems Inc. v. AT & T,* 101 F.R.D. 317, 321, 1984–1 Trade Cas. (CCH) ¶ 65,920 (E.D.Pa.1984) (denying class certi-

fication on basis that it is not enough to prove in the abstract that the PCA requirement violated the antitrust laws; requiring instead proof on a product-by-product basis). Although we, of course, intimate no opinion as to these opinions, we note that none have been as broad as the order we here have under consideration.

## II. ANALYSIS

### A. *Offensive Collateral Estoppel or Issue Preclusion.*

■ Under the doctrine of offensive collateral estoppel or issue preclusion, a defendant is precluded from relitigating identical issues that the defendant litigated and lost against another plaintiff. *See, e.g., Southern Pacific Communications Co. v. AT & T,* 740 F.2d 1011, 1014 n. 2 (1984). The doctrine is detailed, difficult, and potentially dangerous. In *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), the Supreme Court refused to prohibit offensive collateral estoppel altogether, saying instead that "the preferable approach ... is not to preclude the use of offensive collateral estoppel, but to grant trial courts broad discretion to determine when it should be applied." 439 U.S. at 331, 99 S.Ct. at 651. Recently, the Court again acknowledged the existence of offensive collateral estoppel, at least against non-governmental defendants. *See United States v. Mendoza,* —— U.S. ——, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984) (holding that offensive collateral estoppel cannot be used against the government).

Under the judicially-developed doctrine of collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit based on a different cause of action involving a party to the prior litigation.... Collateral estoppel ... serves to "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication."

*Id.* at 571 (quoting *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980)). Thus, it is beyond peradventure that the doctrine of offensive collateral estoppel or issue preclusion is firmly fixed in the firmament of federal jurisprudence.

▉ Briefly stated, three conditions must be satisfied before a party can use issue preclusion to estop a party from relitigating an identical issue previously decided.

(1) [T]he issue must have been actually litigated, that is contested by the parties and submitted for determination by the court.

(2) [T]he issue must have been "actually and necessarily determined by a court of competent jurisdiction" in the first trial.

(3) [P]reclusion in the second trial must not work an unfairness.

*Otherson v. Department of Justice, INS,* 711 F.2d 267, 273 (D.C.Cir.1983); *see also Nations v. Sun Oil Co. (Delaware),* 695 F.2d 933, 938 (5th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 239, 78 L.Ed.2d 229 (1983); *Luben Industries, Inc. v. United States,* 707 F.2d 1037, 1039 (9th Cir.1983); *Deweese v. Town of Palm Beach,* 688 F.2d 731 (11th Cir.1982); *Oberweis Dairy v. Associated Milk Producers,* 553 F.Supp. 962, 967 (N.D.Ill.1982); *GAF Corp. v. Eastman Kodak Co.,* 519 F.Supp. 1203, 1211–12 (S.D. N.Y.1981).

[4] Where offensive estoppel is involved, the element of "fairness" gains special importance. In *Parklane Hosiery,* the Supreme Court stated: "The general rule should be that in cases where a plaintiff could easily have joined in the earlier action or where ... the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel." 439 U.S. at 331, 99 S.Ct. at 651. "Fairness to the defendant" thus is a critical finding necessary for the application of offensive estoppel. "Trial courts should take into account a variety of considerations, all relevant to the ultimate question: Would application of offensive estoppel be unfair to the defend-

ant?" *Carr v. District of Columbia,* 646 F.2d 599, 605 (D.C.Cir.1980). This notion of fairness reflects the equitable nature of issue preclusion.

Collateral estoppel is an equitable doctrine. Offensive collateral estoppel is even a cut above that in the scale of equitable values. It is a doctrine of equitable discretion to be applied only when the alignment of the parties and the legal and factual issues raised warrant it.... Its application is controlled by the principles of equity.... [F]airness to both parties must be considered when it is applied.

*Nations v. Sun Oil Co. (Delaware),* 705 F.2d 742, 744–45 (5th Cir.1983) (on petition for rehearing and suggestion for rehearing en banc), *cert. denied,* —— U.S. ——, 104 S.Ct. 239, 78 L.Ed.2d 229 (1983); *see also Luben Industries, Inc. v. United States,* 707 F.2d 1037 (9th Cir.1983); *Collins v. Seaboard Coastline R.R. Co.,* 681 F.2d 1333 (11th Cir.1982); *Deweese v. Town of Palm Beach, supra; Crowder v. Lash,* 687 F.2d 996 (7th Cir.1982); *Hicks v. Quaker Oats Co.,* 662 F.2d 1158, 1170 (5th Cir.1981) ("As a preliminary matter, we note that considerations of fairness are of great importance in determining when use of offensive collateral estoppel should be permitted."); *Johnson v. United States,* 576 F.2d 606, 614 (5th Cir.1978) (noting that collateral estoppel must not work an injustice against the party precluded); Annot., 58 L.Ed. 938, 944 (1979) ("The overriding consideration in abandoning a strict application of the doctrine of mutuality of parties, and applying collateral estoppel ... is fairness to that party ....").

In *Parklane Hosiery,* the Court identified four examples in which the application of offensive estoppel would be "unfair". Offensive estoppel should not be applied:

(1) where the party asserting it easily could have joined in the action upon which reliance is placed;

(2) where the party against whom it is to be applied had no incentive to defend vigorously the first action;

(3) where the second action offers procedural opportunities unavailable in the first action;

(4) where the judgment relied on is inconsistent with other decisions.

*Parklane Hosiery,* 439 U.S. at 328–31, 99 S.Ct. at 650–51. These examples do not constitute an exhaustive list. *Id.* at 331, 99 S.Ct. at 651.

B. *Standard of Review.*

[5] As the Supreme Court indicated in *Parklane Hosiery,* the application of offensive estoppel is within the discretion of the trial judge. 439 U.S. at 322, 99 S.Ct. at 645. Thus, in reviewing the district court's decision to apply offensive estoppel, this court is bound by the abuse of discretion standard. *See, e.g., Southern Pacific Communications v. AT & T,* 740 F.2d 1011, 1017; *Collins v. Seaboard Coastline R.R. Co.,* 681 F.2d 1333 (11th Cir.1982). That "abuse of discretion" is our standard of review, however, does not require us to turn a blind eye to errors that may have been committed. *See generally Burns v. United States,* 287 U.S. 216, 222–23, 53 S.Ct. 154, 156, 77 L.Ed. 266 (1932); *Coca-Cola Co. v. Tropicana Products,* 690 F.2d 312 (2d Cir.1982); 2 Fed.Proc.L.Ed. § 3:654 (1981). As one appellate court observed in reviewing a district court's decision to apply offensive estoppel: "[The trial court's] discretion is not unlimited, however. Where there is a significant likelihood of substantial unfairness, application of offensive collateral estoppel constitutes an abuse of discretion." *Deweese v. Town of Palm Beach,* 688 F.2d 731, 734 (11th Cir. 1982). *See also Collins v. Seaboard Coastline R.R. Co.,* 681 F.2d 1333 (11th Cir.1982) (court must examine the premises upon which discretion is based).

C. *Discussion.*

The parties have raised numerous arguments. Our review of these arguments is made more difficult than it might otherwise have been by the terseness of the district court's opinion. *Compare Larkin General Hospital, supra* (the opinion under review) *with Oberweis Dairy v. Associated Milk Producers, Inc.,* 553 F.Supp. 962 (N.D.Ill.1982) *and GAF Corp. v. Eastman Kodak Co.,* 519 F.Supp. 1203 (S.D.N.Y. 1981). Although the decision to grant or deny offensive estoppel is within the district court's discretion, we conclude that in this case, the district court abused that discretion in broadly applying offensive estoppel. As the Fifth Circuit observed: "The doctrines [of res judicata and collateral estoppel] must be used … not as clubs but as fine instruments that protect the litigant's right to a hearing as well as his adversary and the courts from repetitive litigation." *Exhibitors Poster Exchange, Inc. v. National Screen Service Corp.,* 421 F.2d 1313, 1316 (5th Cir.1970).

1. *The erroneous exclusion of state regulatory decisions.*

■ As a corollary to the concept that "fairness" to the defendant must be the touchstone in offensive estoppel cases, issue preclusion cannot be invoked against a party who did not have a "full and fair" opportunity to litigate the issue to be precluded. *See, e.g., Allen v. McCurry,* 449 U.S. 90, 95, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980); *Blonder-Tongue Laboratories v. University of Illinois Foundation,* 402 U.S. 313, 333, 91 S.Ct. 1434, 1445, 28 L.Ed.2d 788 (1971). In *Blonder-Tongue Laboratories,* the Court indicated that the "full and fair" opportunity inquiry includes the question of "whether without fault of his own the [party against whom collateral estoppel is to be invoked] was deprived of crucial evidence or witnesses in the first litigation." *Id.* at 333, 91 S.Ct. at 1445. *Cf. Carr v. District of Columbia,* 646 F.2d 599, 606 (D.C.Cir.1980); *Butler v. Stover Bros. Trucking Co.,* 546 F.2d 544 (7th Cir. 1977). Similarly, the Restatement (Second) of Judgments suggests that collateral estoppel should not be applied in situations where important, material evidence can be introduced in the current trial that was unavailable in the previous trial. Restatement (Second) of Judgments § 29, comment j, at 297.

■ AT & T vigorously argues that it was denied a full and fair opportunity to litigate its liability in *Litton* because the *Litton* trial judge erroneously excluded evidence relating to state regulatory decisions. Specifically, the trial judge prevented AT & T from introducing a 1969 decision of the New York Public Service Commission which had addressed the merits of the interface tariff. *New York Telephone Co.*, 79 P.U.R.3d 410, 417 (1969). AT & T argues that had the trial court admitted this evidence, AT & T would have moved for the admission of other similar state regulatory decisions. To bolster its multiple-decision argument, AT & T has identified to this court several state regulatory decisions whose admission it would move in a new trial. For purposes of this review, we shall treat the trial court's exclusionary ruling as applying, as indeed it would have been applied, to all state regulatory decisions.

The Second Circuit held that this evidence was relevant and that the trial court had erred in excluding it. *Litton Systems v. AT & T*, 700 F.2d at 819. That court, however, concluded that in light of the lengthy and complex trial that had just been completed, the error was harmless. *Id.* AT & T contends that this evidence would demonstrate the reasonableness of AT & T's belief that the interface requirement was in the public interest and might ultimately receive the FCC's approval.

We agree with AT & T that these state regulatory decisions could influence a determination of AT & T's alleged liability. The Second Circuit itself acknowledged that this evidence was "arguably probative of AT & T's position." *Litton Systems v. AT & T*, 700 F.2d at 819. These decisions may be relevant to the reasonableness of the interface device requirement, which, in turn, may be relevant to AT & T's ultimate liability since a finding by a state regulatory authority that the interface tariff is necessary to protect AT & T's network may bolster AT & T's claim that its actions were in the public interest. As the Ninth Circuit stated:

When the regulated entity assertedly attempts to respond to its duties as a common carrier by filing and implementing an anticompetitive tariff, the antitrust laws do not apply to the tariff without regard to the technical and legal constraints flowing from the regulatory structure. If a defendant can establish that, at the time the various anticompetitive acts alleged ... were taken, it had a reasonable basis to conclude that its actions were necessitated by concrete factual imperatives recognized as legitimate by the regulatory authority, then its actions did not violate the antitrust laws.

*Phonetele, Inc. v. AT & T*, 664 F.2d 716, 737–38 (9th Cir.1981), *cert. denied*, 459 U.S. 1145, 103 S.Ct. 785, 74 L.Ed.2d 992 (1983); *see also MCI Communications v. AT & T*, 708 F.2d 1081, 1109–10 (7th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). Recently, we too emphasized the importance of "reasonableness" determinations in private antitrust suits against regulated enterprises such as AT & T. "The 'reasonableness' component of this test requires that AT & T have a reasonable basis in terms of concerns for the public interest that are concrete, articulable, and recognized as legitimate by the appropriate regulatory agencies." *Southern Pacific Communications Co. v. AT & T*, 740 F.2d 980, 1009 (D.C.Cir.1984).

Appellees argue that these state regulatory decisions are irrelevant to AT & T's alleged liability because of the principles articulated in either *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), or *Telerent Leasing Corp.*, 45 F.C.C.2d 204 (1974), *aff'd sub nom. North Carolina Utilities Commission v. FCC*, 537 F.2d 787 (4th Cir.), *cert. denied*, 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d 631 (1976). We reject this argument. As a threshold matter, this argument conflicts with the *Litton* holding that the state decisions are relevant to AT & T's liability. More important, neither *Cantor* nor *Telerent* precludes the evidentiary use of state regulatory decisions in the case *sub judice*.

In *Telerent*, the FCC asserted its jurisdiction over the interconnection of customer-provided equipment to telephone terminals. Yet *Telerent*, contrary to appellees' assertion, is of limited significance to our discussion since the regulatory decisions that AT & T seeks to introduce were decided before *Telerent* was issued and finally upheld in the courts. (The Supreme Court denied certiorari in 1976.) Thus, at the time of these state regulatory decisions, the states may have had—or at least may have reasonably believed that they had—shared jurisdiction over the interconnection of telephone terminal equipment. The relevance of these decisions to AT & T's contemporaneous conduct and beliefs is not eviscerated by the FCC's *subsequent* assertion of jurisdiction. Simply, good faith state regulatory decisions are relevant to the reasonableness of AT & T's alleged belief that the interface tariff was in the public interest.

Similarly, *Cantor* does not prohibit the admissibility of these state regulatory decisions since the Supreme Court there held only that a state's approval of a tariff does not automatically confer antitrust immunity on the party filing the tariff. *Cantor* did not exclude the possibility that a regulatory commission's actions nonetheless might be some evidence of the reasonableness of a position taken by a regulated industry. *See generally MCI Communication v. AT & T*, 708 F.2d at 1109–10. Certainly, *Cantor* should not be read, as appellees would have us do, for the proposition that state regulatory decisions are wholly irrelevant to the antitrust defense of a regulated industry.

We are persuaded by AT & T's argument that the existence of this acknowledged error in the presentation of the case to the *Litton* jury is a serious obstacle to the plaintiffs' use of offensive estoppel on the issue of AT & T's liability. While, standing by itself, such error might not tip the scale against such estoppel, when added to the other factors discussed below, the application of offensive estoppel in this case would be unfair. This excluded evidence would bear directly on the *Litton* jury's imposition of liability on AT & T for "filing the interface tariff in bad faith" and for "opposing certification in bad faith." Jury Interrogatories 6a, 6c, *infra*. Moreover, we cannot conclude that this evidence, which arguably could shed some light on AT & T's beliefs and intentions, could not lead to a different conclusion in a new trial on the other interrogatories submitted to the jury. In the reasoning of the Court in *Blonder-Tongue Laboratories*, the defendant, without fault of its own, was deprived of crucial evidence in the first litigation. Thus, the district court acted contrary to the clear directives of that decision, and abused its discretion in permitting offensive estoppel.

Nor do we believe our conclusion to conflict with *Litton*'s holding that the exclusion of this evidence did not constitute prejudicial error. 700 F.2d at 819. The *Litton* court was reviewing a jury trial that already had transpired and that had produced a lengthy and complex record. Armed with this documentation, the Second Circuit could review the record and conclude that the omission of a single state regulatory decision did not constitute prejudicial error—did not affect AT & T's substantial rights in the context of that case. In contrast, our inquiry into the fairness of offensive estoppel is not limited narrowly to a review of a specific record and a specific jury. We must consider whether it is possible that the several state regulatory decisions that AT & T has identified could lead a jury in a new trial to reach a different result. Because that possibility cannot be ruled out, offensive estoppel was improvidently granted.

■ More important, the premise underlying the argument that the Second Circuit's "harmless error" conclusion binds our decision today is that the standard for "reversible error" and the standard for "errors precluding offensive estoppel" must be the same. This we decline to hold. Indeed, we have noted approvingly, albeit in dicta, another court's conclusion that "newly discovered evidence, *even if insuf-*

*ficient to justify setting aside a judgment,* may warrant refusal to give the judgment preclusive effect in other actions." *Carr v. District of Columbia,* 646 F.2d 599, 606 n. 35 (D.C.Cir.1980) (emphasis added) (citing *1776 K Street Associates v. United States,* 602 F.2d 354, 358 (Ct.Cl. 1979), *cert. denied,* 447 U.S. 905, 100 S.Ct. 2985, 64 L.Ed.2d 853 (1980)). Similarly, the Restatement (Second) of Judgments bolsters our conclusion that the same standards are not applicable when deciding whether to overturn a jury's verdict and when deciding whether a trial court properly applied offensive estoppel:

> It is unnecessary that the party seeking to avoid preclusion show, as he must in seeking to set aside a judgment, that the evidence could not have been discovered with due diligence; *the question is not whether a prior determination should be set aside but whether it should be treated as conclusive for further purposes.*

Restatement (Second) of Judgments § 29 comment j, at 297 (emphasis added).

Thus, the only issue relevant to our analysis today is whether *Litton* should be treated as conclusive for purposes of applying offensive estoppel in this case. As explained above, the Supreme Court's language in *Blonder-Tongue Laboratories* leaves no room for dispute. Accordingly, we decline to hold that the Second Circuit's conclusion of harmless error mandates the same result here and we reject the argument that merely because the Second Circuit, in the context of reviewing a jury's conclusion, deemed the erroneous exclusion of a state regulatory decision to be harmless error, that we must ignore that error in our analysis of offensive estoppel.

2. *The government suit against AT & T.*

The next issue features the interplay between:

(1) the Supreme Court's observation in *Parklane Hosiery* that offensive estoppel is inappropriate where inconsistent determinations exist;

(2) the *Noerr-Pennington* doctrine as applied in the government suit;

(3) the *Noerr-Pennington* doctrine as applied in *Litton.*

AT & T contends that Judge Greene's opinion represents a determination inconsistent with *Litton* on the *Noerr-Pennington* issue. Following oral argument we asked for and received supplemental briefs on this subject. These briefs, together with the original filings and the opinions themselves, convince us that AT & T's argument has merit and that the district court failed to catch the clear impact of Judge Greene's ruling on this point. We therefore hold that, in light of this inconsistent determination, the district court abused its discretion in granting plaintiffs' motion for offensive estoppel.

The district court's analysis of this issue is, by its own admission, brief. "The short answer to the argument is that those 'decisions' are neither the final judgments contemplated by the rule of collateral estoppel nor are they 'inconsistent' with either the ultimate facts or the law of *Litton.*" *Larkin General Hospital v. AT & T,* 566 F.Supp. at 300. We disagree with each component of the district court's conclusion regarding Judge Greene's decision.

Underlying the inconsistent determination exception to the doctrine of offensive estoppel is a notion of confidence. The Restatement clearly articulates this rationale:

> f. *Inconsistent prior determinations.* Giving a prior determination of an issue conclusive effect in subsequent litigation is justified not merely as avoiding further costs of litigation but also by underlying confidence that the result reached is substantially correct. Where a determination relied on as preclusive is itself inconsistent with some other adjudication of the same issue, that confidence is generally unwarranted. The inference, rather, is that the outcomes may have been based on equally reasonable resolutions of doubt as to the probative strength of the evidence or the appropriate application of a legal rule to the evidence. That

such a doubtful determination has been given effect in the action in which it was reached does not require that it be given effect against the party in litigation against another adversary.

Restatement (Second) of Judgments § 29 comment f, at 295. *See also Offensive Collateral Estoppel in Asbestos Litigation: Hardy v. Johns-Manville Sales Corp.*, 15 Conn.L.J. 247, 265 (1983) ("Collateral estoppel is, in part, a reflection of confidence in the determination of a prior action. Where another court reaches an inconsistent determination, the confidence in the primary case is undermined."). Significantly, there is no mention of "finality". The only requirement is that the inconsistent determination undermines the court's confidence in the correctness of the prior decision.

Contrary to Jack Faucett's argument, *Parklane Hosiery* does not hold that only inconsistent *judgments* can preclude offensive estoppel. Admittedly, the Court stated that: "Allowing offensive collateral estoppel may also be unfair to a defendant if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous *judgments* in favor of the defendant." 439 U.S. at 330, 99 S.Ct. at 651 (emphasis added). In applying this test, however, the Court stated that the "judgment in the SEC action was not inconsistent with any previous *decision.*" *Id.* at 332, 99 S.Ct. at 652 (emphasis added). Moreover, the draft of the Restatement (Second) of Judgments referenced by the Court used the term "inconsistent *determinations.*" Restatement (Second) of Judgments § 88(4) (Tent.Draft No. 2, Apr. 15, 1975) (emphasis added). Because of this inconsistency in terminology and because of the absence of any explicit consideration of this issue, we cannot agree with appellees that the Supreme Court held that only inconsistent *judgments* could preclude offensive estoppel. The Court did not address this issue directly and we have no reason to limit the reasoning of the Court to an arbitrary distinction between judgments and other judicial determinations. The rationale for the inconsistency rule is equally pertinent wherever the inconsistency occurs.

■ We thus hold that the district court erred in concluding that the absence of "finality" alone prevented AT & T from arguing that the government's suit was an inconsistent determination. The court erroneously relied exclusively on the concept of "finality" that is required to utilize a case for offensive estoppel. But the "inconsistent determination" that precludes offensive estoppel need not be "final" in the same sense. It is enough if that inconsistent determination undermines the court's confidence in the earlier decision. By considering nothing beyond the bald label of "finality," the district court therefore abused its discretion. Although offensive estoppel questions are within the district court's discretion, that court must affirmatively exercise that discretion and cannot take refuge in convenient but conclusory terms.

We do not suggest that every utterance by a court should constitute a determination sufficient to constitute an "inconsistent determination." A district court should consider the facts of any given case including, for example, the posture of the opinion (i.e., whether it represents an interlocutory motion or a final judgment) and the attention and care that the decision devotes to the issue. Although the precise contours of this test will have to be developed on a case-by-case basis, the district court cannot merely rest on an unsupported statement that the allegedly inconsistent determination lacks "finality."

■ Turning to this case, the opinion in the government suit is sufficiently definite and firm on the *Noerr-Pennington* issue to trigger the "inconsistent determination" exception to the application of offensive estoppel. Judge Greene held that AT & T's persistent opposition to equipment certification rules in FCC proceedings was protected under the *Noerr-Pennington* doctrine and could not be grist for antitrust claims. While he denied AT & T's motion to dismiss the charges in their entirety, he did strike the government's allegations

with prejudice. The result procedurally was the equivalent of a partial summary judgment against the government. That ruling had sufficient elements of substance and finality to qualify as an "inconsistent determination."

If Judge Greene's opinion in that suit treats *Noerr-Pennington* inconsistently with *Litton*'s treatment of the same doctrine, confidence in the *Litton* conclusions as to AT & T's liability would be unwarranted. Although Judge Greene indicated that some of his conclusions could be modified as AT & T presented its case in defense, we doubt that AT & T would have introduced evidence undermining Judge Greene's pro-AT & T rulings. In any event, Judge Greene's opinion specifically and carefully discussed the *Noerr-Pennington* doctrine and its application to AT & T's conduct. Judge Greene found that certain documents and certain positions taken by AT & T were protected by *Noerr-Pennington* and that AT & T's activities, for the most part, did not fall within the sham exception. *See supra* at 122 (quoting *United States v. AT & T*, 524 F.Supp. 1350 n. 54, 1352, 1363 & n. 110, 1364 n. 117). Judge Greene explicitly ruled that certain pieces of evidence and types of evidence were protected and invited the parties to submit a list of government contentions to be stricken.

When *Litton*'s treatment of the *Noerr-Pennington* doctrine is juxtaposed with Judge Greene's treatment of the same issue the inconsistencies become evident. In stark contrast to the treatment of *Noerr-Pennington* presented in the government litigation, *Litton* concluded that *Noerr-Pennington* offered AT & T *no* protection. Two of the judges in *Litton* concluded that the doctrine was wholly inapplicable, while all three agreed that if it did apply, AT & T's activities fell within the sham exception. *Litton* identified no protected evidence, and, beyond the sham exception, discussed no other exception to *Noerr-Pennington*. Yet, the evidence introduced in *Litton* included documents that were the same as, or similar to, those that Judge Greene identified as protected. In re-

sponse, Jack Faucett suggests that the *Litton* court admitted this evidence under one of the exceptions to *Noerr-Pennington* that Judge Greene had identified. For example, it is argued that certain documents were admitted in *Litton* solely to demonstrate AT & T's inconsistent positions, as exception recognized by Judge Greene. There is, however, *nothing* to suggest that the court in *Litton* considered, much less applied, this exception. Alternatively, Jack Faucett suggests that the *Litton* jury did not rely on the documents that Judge Greene would have excluded. Jack Faucett, however, has no basis for this assertion.

Clearly then, the conclusions in *Litton* reveal a different analytical path than that followed by Judge Greene, who found certain documents protected and who concluded that the sham exception was largely inapplicable. This disparity in results demonstrates that these two opinions are inconsistent in their treatment of AT & T and the *Noerr-Pennington* doctrine. Each court applied the same doctrine to largely the same facts but reached opposite conclusions about the reach of *Noerr-Pennington*. Appellees can gain no comfort from the settlement of the government case, since, as Judge Greene's opinion demonstrates, the *Noerr-Pennington* issue was fiercely contested through the adversarial process. Therefore, we confront the classic case of inconsistent determinations. To use one decision as the basis for offensive estoppel while ignoring the other decision raises the specific concerns about fairness to the defendant that the Supreme Court articulated in *Parklane Hosiery*.

In sum, we hold that the district court abused its discretion in granting plaintiffs' motion for offensive estoppel on issues of AT & T's liability. Central to *Litton*'s determination of AT & T's liability was its discussion of the *Noerr-Pennington* doctrine. Yet, *Litton*'s discussion of *Noerr-Pennington* and Judge Greene's analysis of the same issue in *United States v. AT & T* are inconsistent. Moreover, we cannot conclude with certainty that the jury's find-

ing of AT & T's liability was uninfluenced by evidence that would have been protected under Judge Greene's *Noerr-Pennington* formula. Thus, *Parklane Hosiery* teaches, offensive estoppel should not have been applied to the issue of liability, or to any issue that traces therefrom. We emphasize, however, that we suggest no opinion as to the correctness of either *Noerr-Pennington* analysis, nor as to that doctrine's application to AT & T's activities.

### 3. *Product market stipulation.*

■ The district court also held that issue preclusion applied to the definition of the relevant product market. On the basis of *Litton,* the court held that "[t]he relevant product market is the sale and lease of telephone terminal equipment consisting of PBX systems and key telephone systems." *Larkin General Hospital,* at 301. AT & T argues that issue preclusion was inappropriate because the parties in *Litton* had stipulated as to the relevant product market. We agree.

A prerequisite to the use of issue preclusion is that the issue actually be litigated. As we recently observed: "Generally speaking, when a particular fact is established not by judicial resolution but by stipulation of the parties, that fact has not been 'actually litigated' and thus is not a proper candidate for issue preclusion." *Otherson v. Department of Justice, INS,* 711 F.2d 267, 274 (D.C.Cir.1983); *see generally id.* and cases cited therein. Because the issue of product market was not litigated in *Litton,* the district court erred in using *Litton* to estop AT & T from litigating this issue.

Jack Faucett points to language in *Otherson* as suggesting a rule that issue preclusion nonetheless is proper when a stipulation merely "helps to shape the record a factfinder will use to determine the truth of a fact." *Id.* at 275. When that language is viewed in its entirety, its inapplicability to this case is evident. Said the court:

> When a stipulation merely helps to shape the record a factfinder will use to deter-

mine the truth of a fact, *rather than to establish the truth of the fact itself,* that fact may be preclusively established in a later trial if the other requirements for issue preclusion are met.

*Id.* (emphasis added). Here, the stipulation in *Litton* established the product market— that is, the stipulation established the truth of the fact itself. Accordingly, the exception indicated in *Otherson* is inapposite to the present litigation.

### 4. *Intentional delay in installing interface devices.*

■ The district court also found, as a subsidiary finding to its conclusion that AT & T attempted to and did obtain monopoly power, that AT & T intentionally delayed in providing and installing the interface devices. *Larkin General Hospital,* at 301 (finding 6, reproduced *supra* at 124). This conclusion was drawn from *Litton* jury interrogatory 16(b), in which the jury had concluded that AT & T was liable for intentional delay in providing and installing interface devices.

Subsequent to argument we asked for additional briefing on several issues, including the degree to which the evidence underlying interrogatory 16(b) was relevant to the plaintiffs in the instant case. Had the *Litton* jury considered AT & T's allegedly dilatory actions only as regards Litton, then, without some other indicia of similarity between the parties, these plaintiffs could not use offensive estoppel on this issue. Not surprisingly, the parties argue vigorously about the extent that the evidence in *Litton* concerned more than Litton Industries on the installation issue. We need not resolve this factual dispute since the parties will have another day to contest this issue.

We hold that the district court abused its discretion in granting plaintiffs' motion for offensive estoppel on the intentional delay issue without first exploring this evidentiary question. Although the district court may have broad discretion, it cannot use that discretion as a shield against meaningful inquiry into the premises underlying its

decisions. Yet we cannot evaluate those premises if the district court does not articulate its analysis more fully than it has in this case. Accordingly, even had the other preconditions for offensive estoppel been met, we would have to reverse and remand this issue to the district court.

### III. CONCLUSION

For the reasons set forth above, we conclude that the district court abused its discretion in granting plaintiffs' broad motion for offensive estoppel. We have considered the other arguments raised by appellees and find them unpersuasive in the context of this appeal. We pause to emphasize that we intimate no opinion whatsoever on the underlying merits of plaintiffs' allegations or on the applicability *vel non* of any legal theory to the merits.

To remove any source of confusion, we apply our conclusions to the specific findings made by the district court. Findings three through nine, which all trace to *Litton*'s determination of AT & T's liability, must be reversed because the *Litton* trial court erroneously excluded crucial evidence and because *Litton*'s *Noerr-Pennington* analysis is inconsistent with Judge Harold Greene's analysis of the same issue in the government versus AT & T case. Finding six, which incorporates jury interrogatory 16(b), must be remanded for the additional reason that the district court failed to make necessary predicate findings. Finding two, relevant to the product market, must be reversed because it is based on a stipulation. Finding one, which states only that these plaintiffs have standing, was not specifically challenged and thus may stand.

Today's decision should not be read as suggesting a lack of sympathy with the district court's efforts to facilitate the resolution of the numerous private antitrust suits pending against AT & T. Nothing we say today is meant to discourage the pursuit of alternative methods to resolve this fast-running and overflowing stream of litigation. But however strong may be the concerns with judicial expediency, a court cannot ignore the relevant legal principles which, in the context of offensive estoppel, establish certain parameters within which the district court must exercise its discretion. The doctrine of offensive collateral estoppel is too fraught with drumhead potential to allow its application without the specific limitations that the Supreme Court, other courts, and legal scholars have enunciated.

*Reversed and remanded.*