**GENERAL DYNAMICS CORPORATION, et al., Plaintiffs,**

v.

**AMERICAN TELEPHONE AND TELEGRAPH COMPANY, etc., Defendants.**

No. 82 C 7941.

United States District Court, N.D. Illinois, E.D.

Dec. 4, 1986.

Philip W. Tone, Richard T. Franch, James A. McKenna, Jenner & Block, Chicago, Ill., for plaintiffs.

Theodore N. Miller, Sidley & Austin, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

Plaintiffs, General Dynamics Corporation, et al. (hereinafter collectively referred to as "General Dynamics"), brought this antitrust action, alleging that defendants, American Telephone and Telegraph Company, et al. (hereinafter collectively referred to as "AT & T"), attempted to and did monopolize the telephone terminal equipment market from approximately 1970 through 1978. This matter is now before the court on General Dynamics' motion to collaterally estop AT & T from relitigating certain issues decided adversely to AT & T in *Litton Systems, Inc. v. AT & T,* 700 F.2d 785 (2d Cir.1983), *cert. denied,* 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984). For the reasons set forth below, the court denies General Dynamics' motion.

### I. Facts

General Dynamics acquired Stromberg-Carlson Corp., a manufacturer and distributor of telecommunications equipment, in 1955. Stromberg-Carlson historically sold the bulk of its equipment to independent (non-Bell) telephone companies, which, in turn, leased the equipment to their customers. Occasionally, Stromberg-Carlson sold its equipment to Bell companies, which also leased the equipment to their customers. Recently, Stromberg-Carlson began distributing its equipment directly to subscribers of both independent and Bell telephone companies.

In Counts I and II of its complaint, General Dynamics claims that AT & T unlawfully monopolized the "customer premises equipment distribution submarket"[1] by interfering with the connection of non-Bell customer premises equipment to the telephone network. More specifically, General Dynamics contends that AT & T interfered

---

1. General Dynamics defines this market as including the design, sale, leasing, installation, interconnection and maintenance of customer premises equipment, including the telephone instrument itself, key telephone systems, and private business exchange ("PBX") systems. *See* Complaint ¶¶ 17(h), 18(b). Key telephone systems allow a single telephone to connect several

other telephones through the use of buttons on the telephones. *Jack Faucett Associates v. AT & T,* 744 F.2d 118, 120 (D.C.Cir.1984), *cert. denied,* 469 U.S. 1196, 105 S.Ct. 980, 83 L.Ed.2d 982 (1985). PBX systems utilize a central console or switchboard to allow the interconnection of numerous lines. *Id.*

with the connection of non-Bell equipment to the telephone system by requiring the use of an interface device, or protective connecting arrangement ("PCA"), and by opposing the certification program that would have eliminated the PCA requirement. General Dynamics brings Count I in its capacity as a competitor of AT & T, seeking recovery of lost profits. General Dynamics brings Count II in its capacity as a customer of AT & T, seeking recovery of PCA charges it paid as a customer using non-Bell equipment. In Count III of its complaint, General Dynamics contends that AT & T unlawfully monopolized the "telecommunications equipment market"[2] by refusing to deal with, or acquire equipment from, manufacturers other than Western Electric Co., now known as AT & T Technologies, Inc. General Dynamics now moves to estop AT & T from relitigating a wide range of liability issues, predominantly arising with respect to Counts I and II.[3]

## A. Regulatory History

The allegations set forth in Counts I and II of General Dynamics' complaint, as well as the claims in *Litton* and in several other actions against AT & T, arise out of changes in federal telecommunications policy during the 1950s and 1960s. The court in *Jack Faucett Associates v. AT & T,* 744 F.2d 118 (D.C.Cir.1984), *cert. denied,* 469 U.S. 1196, 105 S.Ct. 980, 79 L.Ed.2d 220 (1985), comprehensively set forth the regulatory history underlying the telephone terminal equipment cases:

Prior to 1956, AT & T, through a tariff filed with the [Federal Communications Commission ("FCC" or "Commission")], prohibited the attachment of all foreign devices to its telephone network. AT & T justified this prohibition as necessary to ensure the safe and effective operation of the national telephone network.

Using the same rationale of operational concerns, the FCC, in 1955, prohibited the use of a sound shield that attached to a telephone's mouthpiece. *Hush–A–Phone Corp.,* 20 F.C.C. 391 (1955). Indicating that actual harm to the network was to be the guiding principle, this court voided that FCC decision, finding the *Hush–A–Phone* ruling to be neither just nor reasonable. *Hush–A–Phone Corp. v. United States,* 238 F.2d 266 (D.C.Cir.1956). This case represented the initial erosion of AT & T's absolute bar against foreign attachments. In *Use of the Carterphone Device in Message Toll Telephone Service,* 13 F.C.C.2d 420, *reconsideration denied,* 14 F.C.C.2d 571 (1968), the FCC applied the *Hush–A–Phone* rationale and declared unlawful the existing foreign attachment prohibition and ordered AT & T to file new tariffs.

In response to *Carterphone,* AT & T filed the so-called interface tariffs that are a focus of this litigation. In broad terms, the tariffs permitted the attachment of foreign devices to the telephone network so long as any electrical connections were through a PCA or other interface device provided by AT & T or its subsidiaries. The FCC permitted the tariffs to become effective, but did so without "giving any specific approval to the revised tariffs." *AT & T "Foreign Attachment" Tariff Revisions,* 15 F.C.C.2d 605, 610 (1968). For several years thereafter, the necessity of requiring the interface device was studied. In 1969, for example, the FCC convened a panel of the National Academy of Sciences to study the problem. And in May 1971, the FCC formed a "PBX Advisory Committee" to study the feasibility of connections to the network without the interface device. State regulatory commissions also investigated AT & T's inter-

---

2. General Dynamics defines this market as including the development, manufacture and distribution of a broad range of equipment designed for use in conjunction with communications services, *i.e.,* central office switching and transmission equipment and customer premises equipment. *See* Complaint ¶ 18(a).

3. The issues General Dynamics seeks to estop AT & T from relitigating also arise in paragraph 46 of Count III, according to General Dynamics.

face tariffs. *See, e.g., New York Telephone Co.*, 79 P.U.R.3d 410, 417 (N.Y. Pub.Serv.Comm'n 1969); *Glusing v. C & P Telephone Co.*, 1974 Md. P.S.C. 377 (Md.Pub.Serv.Comm'n).

In 1972, the FCC instituted rulemaking proceedings to address the interconnection issues. During the proceedings the PBX Committee submitted a report that included a model certification program. Under a certification program, terminal equipment that met certain standards could connect to the AT & T network without any interface device. AT & T, whether motivated by a genuine desire to protect its network or by a desire to protect its alleged monopoly, opposed the certification standard by filing comments with the Commission and, allegedly, by taking other steps in opposition. Despite this opposition, the FCC, in late 1975, adopted regulations establishing certification standards. *Proposals for New or Revised Classes of Interstate and Foreign Message Toll Telephone Service (MTS) and Wide Area Telephone Service (WATS)*, 56 F.C.C.2d 593, 599–613 (1975). Subsequently, the FCC applied its certification regulations to customer-provided terminal equipment. 58 F.C.C.2d 736 (1976). The Commission's order was affirmed on appeal. *North Carolina Utilities Commission v. FCC*, 552 F.2d 1036 (4th Cir.), *cert. denied*, 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977).

*Faucett*, 744 F.2d at 120–21. *See also Litton*, 700 F.2d at 790–98; *Glictronix Corp. v. AT & T*, 603 F.Supp. 552, 556–57 (D.N.J. 1984); *Selectron, Inc. v. AT & T*, 587 F.Supp. 856, 858–59 (D.Ore.1984); *United States v. AT & T*, 524 F.Supp. 1336, 1348–50 (D.D.C.1981).

### B. Prior Cases

General Dynamics seeks to estop AT & T on the basis of the *Litton* jury verdict, and it is to this case that the court now turns. However, also relevant to this court's determination is the government case against AT & T, *United States v. AT & T*, 524 F.Supp. 1336, and the five cases in which courts have already decided whether to estop AT & T on the basis of *Litton, Faucett*, 744 F.2d 118; *Glictronix*, 603 F.Supp. 552; *Selectron*, 587 F.Supp. 856; *Wrede v. AT & T*, 1985–1 Trade Cases ¶ 66,563 (M.D.Ga. 1984); *Phonetele v. AT & T*, 1984–1 Trade Cases ¶ 65,921 (C.D.Ca.1984).

#### 1. The Litton Decision

The *Faucett* court set forth *Litton*'s history and holding:

In June 1976, Litton Systems and some of its subsidiaries (collectively referred to as Litton) brought an antitrust action in the United States District Court for the Southern District of New York against AT & T, Western Electric Company, Bell Telephone Laboratories, and several Bell operating companies. Litton, suing as both competitor and customer, alleged that AT & T had monopolized and attempted to monopolize the telephone terminal equipment market by requiring the use of the interface device and by opposing the certification program that would have abolished that requirement.

The *Litton* litigation was lengthy and complex. Pretrial proceedings consumed over four years. Trial began in 1980, ran for more than five months and generated 18,000 pages of testimony and 945 exhibits. The jury ultimately found for Litton, concluding that, *inter alia*, AT & T had filed the interface tariff in bad faith, had intentionally delayed in providing and installing the interface devices, and had opposed certification in bad faith....[4] The jury awarded damages in the sum of $92,258,243, before trebling.

---

**4.** When the *Litton* jury first returned its verdict finding AT & T guilty of monopolization, it had failed to reach unanimity on special interrogatories 16(a) (asking whether AT & T filed the interface tariff in bad faith), 16(i) (asking whether AT & T delayed in making cutovers in bad faith), and 7 (asking whether AT & T's attempted monopolization was a proximate cause of injury to the plaintiffs). Special interrogatory 16 listed nine alleged practices of AT & T, and asked the jury to identify the practices on which it based its finding of predatory conduct. Although the jury had failed to reach unanimity on special interrogatories 16(a) and 16(i), it

On appeal the Second Circuit affirmed. 700 F.2d 785 (2d Cir.1983).... Significantly, the court, two judges concurring, held that AT & T's actions were not within the ambit of the *Noerr-Pennington* doctrine. *Id.* at 806–09. This conclusion, the court indicated, was required because AT & T was " 'engaged in private commercial activity, no element of which involved seeking to procure the passage or enforcement of laws.' The decision to impose and maintain the interface tariff was made in the AT & T boardroom, not at the FCC...." *Id.* at 807. The court thus concluded that AT & T's opposition to certification "embraced much more than merely advocating a position before the FCC." *Id.* at 809. Alternatively, the court, all three judges concurring, held that if *Noerr-Pennington* were applicable, liability attached since AT & T's actions were within the sham exception.

[The Second Circuit also concluded] that the trial court erred in excluding a 1969 New York State Public Service Commission decision that approved the interface requirement as a reasonable means of protecting the AT & T network from harm.... The court, however, held that in light of the "complicated and extensive trial" the error was harmless. *Id.* [at 819.]

*Faucett,* 744 F.2d at 123. *See also Glictronix,* 603 F.Supp. at 559; *Selectron,* 587 F.Supp. at 859.

## 2. The Government Case

In 1979, the United States filed an antitrust action against AT & T, et al., alleging that AT & T, through a variety of actions including the PCA requirement, had violated the Sherman Act, 15 U.S.C. § 1 et seq.

*United States v. AT & T,* 524 F.Supp. 1336. The Government and Litton litigated their suits contemporaneously; in fact, the *Litton* allegations and evidence constituted a separate "episode" in the Government case. *See United States v. AT & T,* 524 F.Supp. at 1349 n. 40. The district court in the Government case, per Judge Harold Greene, ordered that the Government have access to Litton's document discovery of AT & T. *United States v. AT & T,* 461 F.Supp. 1314, 1340–41 (D.D.C.1978).

After the Government presented its case in chief, AT & T moved to dismiss the suit under Fed.R.Civ.P. 41(b), contending that the Government presented insufficient evidence to support a verdict. Judge Greene largely denied AT & T's motion in an avowedly " 'tentative and inconclusive ruling on the quantum of plaintiff's proof.' " *Id.* at 1343 (*quoting Armour Research Foundation v. Chicago, Rock Island and Pacific Railroad Co.,* 311 F.2d 493, 494 (7th Cir.1963), *cert. denied,* 372 U.S. 996, 83 S.Ct. 1091, 10 L.Ed.2d 129 (1963)). The court, however, found that the *Noerr-Pennington* doctrine shields AT & T's opposition to certification standards from antitrust liability. *United States v. AT & T,* 524 F.Supp. at 1361–64. Shortly after Judge Greene's decision, during the trial, the parties entered into a consent decree, resulting in the well-known AT & T "breakup." *United States v. AT & T,* 552 F.Supp. 131 (D.D.C.1982), *aff'd,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). *See Faucett,* 744 F.2d at 121–23; *Southern Pacific Communications Co. v. AT & T,* 740 F.2d 1011, 1016–17 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 380 (1985); *Glictronix,* 603 F.Supp. at 569–70; *Selectron,* 587 F.Supp. at 864–65.

---

answered in the affirmative with respect to three of the interrogatories: 16(b) (asking whether AT & T intentionally delayed in providing and installing interface devices), 16(c) (asking whether AT & T opposed certification in bad faith), and 16(h) (asking whether AT & T, in bad faith, refused to sell inside wiring at all or on a reasonable basis).

After the initial verdict, although the court was of the opinion that the answer to special

interrogatory 16(c) could support the damage award, the court instructed the jury to return to deliberations to try to answer interrogatories 7, 16(a) and 16(i). The jury, after deliberating approximately a half hour, returned and found against AT & T on all three issues. The jury did not change the amount of damages it had already calculated, however. *See Litton,* 700 F.2d at 802–04; *Glictronix,* 603 F.Supp. at 565–66.

### 3. The Post-Litton Collateral Estoppel Cases

As stated above, five other courts have already considered whether, and to what extent, the *Litton* jury verdict should estop AT & T from relitigating certain issues. In *Faucett*, 744 F.2d 118, the only appellate decision, plaintiffs, seven businesses that were forced to acquire interface devices from AT & T between 1968 and 1978, contended that the interface devices violated the Sherman Act. Plaintiffs sought to estop AT & T from litigating several liability issues allegedly determined in *Litton*. *Faucett*, 744 F.2d at 123–24. The court did not allow offensive collateral estoppel against AT & T on any issue, finding that (1) A & T did not have a full and fair opportunity to litigate in *Litton* because of the exclusion of certain state regulatory decisions; (2) the *Litton* court's *Noerr-Pennington* holding is inconsistent with Judge Greene's opinion in *United States v. AT & T*, 524 F.Supp. 1336; (3) the *Litton* parties did not actually litigate the question of what constitutes the relevant market, but rather stipulated as to the relevant market; and (4) the *Litton* court did not specifically find that AT & T delayed in installing interface devices for the *Faucett* plaintiffs.

The plaintiff in *Glictronix*, 603 F.Supp. 552, a retailer of telephone terminal equipment, sought to estop AT & T from litigating approximately the same issues for which the *Faucett* plaintiffs sought estoppel. *Glictronix*, 603 F.Supp. at 559. The court denied Glictronix' motion for collateral estoppel, finding that (1) the *Litton* court's *Noerr-Pennington* holding conflicted with Judge Greene's opinion; (2) AT & T did not have a full and fair opportunity to litigate in *Litton* because of the court's exclusion of state regulatory decisions and because of new evidence discovered after the *Litton* decision; (3) the *Litton* parties did not actually litigate the product market

issue; and (4) the *Litton* court did not make specific findings with regard to AT & T's alleged delay in making cutovers, and refusal to sell wiring, for Glictronix' equipment. However, the *Glictronix* court found that (1) the "belated" jury findings were alternative, and therefore necessary, grounds for the Litton verdict; (2) state and federal regulatory decisions and various reports do not constitute inconsistent decisions which may prevent estoppel based on *Litton;* (3) the *Litton* court correctly stated the *Noerr-Pennington* doctrine; and (4) the *Litton* decision was not based on a false premise and is entitled to confidence.

The court in *Selectron*, 587 F.Supp. 856, permitted offensive collateral estoppel against AT & T on several issues. The court found that (1) the *Litton* court's *Noerr-Pennington* holding was in accord with precedent and did not conflict with Judge Greene's avowedly tentative decision in the Government case; (2) the "belated" jury findings were alternative, and therefore necessary, grounds for the *Litton* verdict; (3) AT & T had a full and fair opportunity to, and did, argue that it filed the interface tariff in good faith, and the addition of the excluded state regulatory decision at a new trial would not affect the result; and (4) AT & T's "new" evidence was not crucial, but rather cumulative, irrelevant or inadmissible. However, the *Selectron* court did not estop AT & T from litigating whether its alleged refusal to sell wiring, and its alleged delay in making cutovers and installing PCAs, specifically affected the *Selectron* plaintiffs.

The courts in *Phonetele, Inc. v. AT & T*, 1984–1 Trade Cases ¶ 65,921 (C.D.Cal.1984), and *Wrede v. AT & T*, 1985–1 Trade Cases ¶ 66,563 (M.D.Ga.1984), did not estop AT & T from litigating any issues on the basis of *Litton*, primarily because the product markets in both cases were significantly different from that in *Litton*.[5]

---

5. The *Phonetele* plaintiff manufactured "Phonemaster," a toll and message-unit restriction device used in conjunction with PBX and key systems. The *Wrede* plaintiffs manufactured an automatic dialing device.

In denying the plaintiff's request for collateral estoppel, the *Phonetele* court also found that the

## II. Offensive Collateral Estoppel

General Dynamics requests the court to estop AT & T from litigating the following issues:

1. Whether the relevant product market is the sale and lease of customer premises equipment (also known as telephone terminal equipment) consisting of PBX systems and key telephone systems.

2. Whether AT & T possessed monopoly power in the relevant market during the period in question in *Litton,* i.e., November 20, 1970 to July 1, 1978.

3. Whether AT & T had specific intent to obtain monopoly power in the relevant market during that period.

4. Whether there was a dangerous probability that AT & T would obtain monopoly power in the relevant market.

5. Whether AT & T attempted to and did willfully obtain and maintain its monopoly power in the relevant market by the following anticompetitive conduct:

(a) filing its tariff requiring an interface device in bad faith;

(b) opposing certification of customer premises equipment in bad faith;

(c) intentionally delaying the provision and installation of interface devices;

(d) refusing in bad faith to sell at all or on a reasonable basis inside wiring which AT & T had installed on a customer's premises; and

(e) delaying in bad faith cutovers from customer premises equipment distributed by AT & T to customer premises equipment distributed by General Dynamics.

6. Whether AT & T's alleged anticompetitive conduct proximately caused injury and damage to General Dynamics in its capacity as a customer forced to pay AT & T's interface device charges.

7. Whether the interface device was not necessary to protect AT & T's telephone network from harm.

8. Whether the *Noerr-Pennington* doctrine is not a defense to AT & T's claims.

*See* General Dynamics' Motion For Determination of Collateral Estoppel.

■■■ "Under the doctrine of collateral estoppel, 'once an issue is actually and necessarily determined by a court of competent jurisdiction, the determination is conclusive in subsequent suits, based on a different cause of action, involving a party to the prior litigation.'" *Garza v. Henderson,* 779 F.2d 390, 392–93 (7th Cir. 1985) (*quoting Crowder v. Lash,* 687 F.2d 996, 1009 (7th Cir.1982)). When a plaintiff seeks to offensively, collaterally estop a defendant from relitigating certain issues, the plaintiff must establish that (1) the party against whom the estoppel is asserted was a party, or was in privity with a party, to the prior litigation;[6] (2) the issues were actually litigated and decided on the merits in the earlier suit; (3) the resolution of the particular issues was necessary to the court's judgment; and (4) the issues in the prior suit are identical to those raised in the subsequent suit. *Falconer v. Meehan,* 804 F.2d 72 (7th Cir.1986); *Kunzelman v. Thompson,* 799 F.2d 1172, 1176, 1178 (7th Cir.1986); *Garza,* 779 F.2d at

"belated" jury findings were "arguably" unnecessary to the verdict. The *Phonetele* court also called into question the correctness of *Litton's* statement of the *Noerr-Pennington* doctrine. The *Wrede* court similarly found the "belated" jury findings unnecessary to the *Litton* verdict. Although the *Wrede* court did not find *Litton's* statement of the *Noerr-Pennington* doctrine incorrect, it found *Litton's* holding on this issue in conflict with Judge Greene's opinion in the Government case.

6. General Dynamics names as defendants in this action all of AT & T's Bell Operating Companies

("BOCs"). Litton sued only seven of the BOCs. However, prior to January 1, 1984, the date of the divestiture of AT & T, the Bell system, including all of the BOCs, was "legally a single enterprise." *United States v. Western Electric Co., Inc.,* 569 F.Supp. 1057, 1070 (D.D.C.1983). *See also United States v. AT & T,* 552 F.Supp. at 202. This court therefore finds that the defendants comprised a single enterprise during the period of time relevant to this suit, and the BOCs not named as defendants in *Litton* were in privity with the *Litton* defendants during the relevant time period.

393; *County of Cook v. MidCon Corp.*, 773 F.2d 892, 898–99 (7th Cir.1985).

In addition, the court should consider whether application of collateral estoppel would be substantially unfair to the party to be estopped. *Ray v. Indiana & Michigan Electric Co.*, 758 F.2d 1148, 1150 (7th Cir.1985). Fairness considerations include the ability of the party asserting collateral estoppel to join in the prior action,[7] incentive to litigate in the prior action, any indication that the first court, at least in patent cases, failed to grasp the issues fully, the existence of judgments inconsistent with the prior judgment, and whether the party to be estopped had a full and fair opportunity to litigate the issue in the prior action. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 328–31, 99 S.Ct. 645, 650–51, 58 L.Ed.2d 552 (1979); *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971); *Faucett*, 744 F.2d at 125–26; *Glictronix*, 603 F.Supp. at 563–64; *Selectron*, 587 F.Supp. at 860. *See also Restatement (Second) of Judgments* § 29; 18 Wright, Miller and Cooper, *Federal Practice and Procedure* § 4465. Importantly, the court has broad discretion to determine when offensive collateral estoppel should be applied. *Parklane*, 439 U.S. at 331, 99 S.Ct. at 651.

### A. Identity Of Issues

AT & T contends that the issues decided in *Litton* are not identical to those in the present case. According to AT & T, the issues are not identical because the relevant product market in this case differs from that in *Litton*, and General Dynamics' competitive position in the marketplace differs from that of Litton.

 First, the court finds that the relevant product market in *Litton* does not differ from that in this case. According to AT & T, the *Litton* market did not include standard telephone instruments, as does the market in this case. However, all PBX and key systems include standard telephone instruments, according to AT & T's own definition of the systems, set forth in its Petition for Certiorari in *Litton*.[8] AT & T also contends that all PBX and key systems are not the same; therefore, *Litton* does not apply to cases involving systems not specifically at issue in *Litton*. The *Glictronix* court considered and rejected this contention, concluding that *Litton* clearly addressed the entire product market, and that a new determination need not be made regarding the specific PBX and key systems at issue in each case. *Glictronix*, 603 F.Supp. at 564–65.

However, AT & T correctly states that General Dynamics and Litton did not share the same competitive position in the telephone terminal equipment market. Litton manufactured and sold to AT & T's customers PBX and key systems to be used with AT & T's phone system. The thrust of Litton's claim at trial, therefore, was

---

**7.** General Dynamics points out that AT & T's Petition for Certiorari in *Litton* acknowledges that there are, or have been, at least seventeen different cases brought against AT & T dealing with the interface tariff. *See* General Dynamics' Memorandum in Support of Motion For Determination of Collateral Estoppel at 12 and Tab "2." This court accordingly finds that, although General Dynamics and the other affected manufacturers may have been able to technically effect joinder in *Litton*, such joinder could not have occurred with "ease." *See Starker v. United States*, 602 F.2d 1341, 1349–50 (9th Cir.1979). The court will therefore not deny estoppel on the basis that General Dynamics might have joined as a plaintiff in *Litton*.

**8.** AT & T defined the systems as follows in its Petition for Certiorari, p. 2:

A PBX includes a switchboard and a number of extension telephones. The PBX can switch calls from one extension telephone to another as well as permit outside calls to be placed and received.

A key telephone system includes telephone sets with buttons or keys and certain common equipment. The keys give each telephone set access to more than one telephone line.

*See* General Dynamics' Reply Memorandum at 64. General Dynamics also points out that the plaintiff in *Selectron* was a General Dynamics' distributor; therefore, that case involved exactly the same PBX and key systems involved in the present case. In *Selectron*, AT & T conceded, and the court found, that the *Selectron* product market was the same as that in *Litton*. *Selectron*, 587 F.Supp. at 859–60.

that AT & T's "baseless" interface tariff and opposition to certification hindered Litton from selling its PBX and key systems to AT & T subscribers. General Dynamics, on the other hand, did not merely manufacture and sell its telephone terminal equipment to AT & T subscribers. Rather, General Dynamics sold a substantial share of its equipment to independent telephone companies, which, like AT & T, leased equipment to customers and permitted interconnection of customer-provided equipment only if a PCA was interposed between such equipment and the telephone network. Therefore, assuming General Dynamics' contention that the PCA requirement was unnecessary and hindered the ability of manufacturers to market their equipment is correct, it is clear that General Dynamics would have benefitted from this requirement in its role as a major supplier of telephone equipment to independent telephone companies. The court now finds that this inconsistency between General Dynamics' current position and prior actions does not merely relate to the question of damages, but places General Dynamics in a different litigating position than that of Litton. Accordingly, the court finds that the issues before the *Litton* court are not identical to those before this court.

### B. Actual Litigation Of Issues In The Prior Case

AT & T asserts that the court should not estop it from litigating the issue of what constitutes the relevant product market. According to AT & T, the *Litton* parties did not actually litigate this issue; rather, they stipulated to the relevant product market.[9] It is clear that, "when a particular fact is established not by judicial resolution but by stipulation of the parties, that fact has not been 'actually litigated' and thus is not a proper candidate for issue preclusion." *Otherson v. Department of Justice, Immigration and Naturalization Service,* 711 F.2d 267, 274–75 (D.C.Cir.

1983). *Cf. Canaan Products, Inc. v. Edward Don & Co.,* 388 F.2d 540, 542–43 (7th Cir.1968) (court denied collateral estoppel motion where issues were not actually litigated in the prior suit, the parties having voluntarily dismissed the suit by stipulation). *See also Restatement (Second) of Judgments* § 27, comment e.

However, "[w]hen a stipulation merely helps to shape the record a factfinder will use to determine the truth of a fact, rather than to establish the truth of the fact itself, that fact may be preclusively established in a later trial if the other requirements for issue preclusion are met." *Otherson,* 711 F.2d at 275. Also, a stipulation which establishes a particular fact can form the basis for collateral estoppel where the parties manifest "an affirmative intention to be bound by the stipulation in future cases." *Kalman v. Berlyn Corp.,* 614 F.Supp. 1327, 1330 (D.C.Mass.1985). *Cf. Southern Pacific,* 740 F.2d at 1021 (courts may give collateral estoppel effect to consent judgments where the parties clearly intend, through far-reaching preclusive language, for the consent judgment to adjudicate once and for all the issues raised in the action).

 The stipulation in *Litton* as to the relevant product market resolved, for that suit, the issue of what constitutes the relevant product market; the stipulation did not merely help shape the record the jury used to determine the issues. Also, the parties did not couch the stipulation in language manifesting an affirmative intention to be bound by the stipulation in future cases. Therefore, this court will not estop AT & T from litigating the relevant product market issue in this suit. *Accord, Faucett,* 744 F.2d at 132; *Glictronix,* 603 F.Supp. at 583.

AT & T also asserts that the court should not estop it from litigating the issues of whether it intentionally delayed the provision and installation of interface devices

---

9. The *Litton* parties stipulated that the relevant product market is the sale and lease of telephone terminal equipment consisting of PBX

and key telephone systems. *See Litton* trial transcript at 18020.

for General Dynamics' equipment in bad faith, whether it refused in bad faith to sell inside wiring to General Dynamics at all or on a reasonable basis, whether it delayed cutovers to General Dynamics' equipment in bad faith, and whether its alleged anti-competitive conduct proximately caused injury to General Dynamics in its capacity as an AT & T customer. AT & T contends that the *Litton* findings on these issues applied only to the *Litton* plaintiffs; the *Litton* jury did not make findings with respect to General Dynamics. General Dynamics contends that the *Litton* findings were not unique to Litton, but extended to other AT & T competitors and customers.

■ This court finds that the *Litton* evidence and findings extended not only to Litton, but to other AT & T competitors and customers. *Litton*, 700 F.2d at 814–16. However, it does not necessarily follow that General Dynamics was among the customers or competitors affected by this conduct. As the *Selectron* court stated:

> Unlike AT & T's filing of the PCA tariff and opposing certification, AT & T's refusal to sell inside wiring and intentional delay in providing essential goods and services to Litton and other competitors may not have affected the *Selectron* plaintiffs. Because of the episodic nature of these issues the court refuses to grant them collateral estoppel effect. *See Starker v. United States*, 602 F.2d 1341, 1348–50 (9th Cir.1979).

*Selectron*, 587 F.Supp. at 867. Therefore, the court finds that the *Litton* parties did not actually litigate the effects of these AT & T practices on General Dynamics, and the court will not estop AT & T from litigating these issues. *Accord, Glictronix*, 603 F.Supp. at 583. *See Faucett*, 744 F.2d at 132–33 (court asked for additional briefing on the degree to which evidence on these issues in *Litton* was relevant to the *Faucett* plaintiffs).

### C. Determination Of Issues Necessary To The Judgment

AT & T contends that the *Litton* jury's decision that AT & T filed the interface tariff in bad faith was not necessary to the *Litton* judgment; therefore, the court should not preclude AT & T from now litigating this issue. As stated earlier, the *Litton* jury reached an initial verdict, returned to deliberations, and then found that AT & T filed the tariff in bad faith, without changing the amount of damages initially assessed. *See supra* n. 4. AT & T contends that, because this finding came after the jury determined damages, the jury "plainly" did not rely on this finding and it was therefore not essential to the judgment. AT & T also asserts that this finding was "undoubtedly reached as a compromise among the jurors," and it is therefore not binding in this case. *See* AT & T's Memorandum in Opposition at 66.

AT & T argued on appeal in *Litton* that the "belated" jury findings were coerced and should therefore be set aside. *Litton*, 700 F.2d at 802–04. The Second Circuit found that the trial court's resubmission of the questions was not in error and that the *Litton* jury was not coerced into rendering answers favorable to Litton upon resubmission. *Id.* The Second Circuit noted that the jury (1) indicated that it was "divided," not "deadlocked," on these issues; (2) took its task seriously, serving over five months without an absence, and deliberated conscientiously for eight days; (3) found against Litton on two of the four theories of liability, and was therefore not predisposed to rule in Litton's favor; and (4) was properly instructed upon resubmission of the questions on "both the importance of reaching a verdict and the necessity of doing so only in accordance with the conscientiously held views of each juror." *Litton*, 700 F.2d at 804 n. 24. The Second Circuit also noted that it could sustain the *Litton* verdict and damage award on the monopoly charge without consideration of the "belated" findings if there were support for the jury's initial findings on three of the alleged predatory practices. *Id.* at 803.

It is clear that the determination of an issue must be necessary to the judgment in order to preclude litigation of the issue in subsequent suits. *Gilldorn Savings Association v. Commerce Savings Association,*

804 F.2d 390 (7th Cir.1986); *Insurance Co. of North America v. Norton,* 716 F.2d 1112, 1115 (7th Cir.1973). The majority view is that all alternative, independent grounds upon which a court may base its decision should be regarded as necessary for purposes of collateral estoppel. *Glictronix,* 603 F.Supp. at 566; *Selectron,* 587 F.2d at 862–63. *See generally* Wright, Miller & Cooper, *supra,* § 4421 at 203–08. *See also Gilldorn,* at 395 (in dicta, court states that, where a court's decision may be based on any one of many alternative, independent grounds, but the court does not explain which ground or grounds it considered or decided, it would be impossible to tell which issues were actually and necessarily decided, and the court's decision might therefore not preclude relitigation of any issue); *Insurance Co. of North America,* 716 F.2d at 1115 (court denied removal of suit to state court in prior action on the fundamental ground that the parties had not yet commenced an action in state court; therefore, finding regarding proper alignment of parties in that action was clearly unnecessary to the decision and would not preclude subsequent litigation on alignment issue).

▮▮ The *Litton* jury's finding that AT & T filed the interface tariff in bad faith was an independent, alternative ground for the *Litton* monopolization verdict. The jury clearly identified all the alternative grounds for its verdict in the special interrogatories. AT & T challenged, and the Second Circuit sustained, this particular finding on appeal. AT & T has presented no evidence that this finding was coerced or the result of a compromise. Therefore, the court finds that this finding was necessary to the *Litton* judgment. *Accord, Glictronix,* 603 F.Supp. at 565–67; *Selectron,* 567 F.Supp. at 862–63.

## D. Fairness to AT & T

### 1. Inconsistent Decisions on AT & T's Noerr-Pennington Defense

▮▮▮▮ Application of collateral estoppel may be unfair where there are judgments inconsistent with the judgment which forms the basis for the collateral estoppel motion. *Parklane,* 439 U.S. at 330, 99 S.Ct. at 651. The *Parklane* court explained:

> In Professor Currie's familiar example, a railroad collision injures 50 passengers all of whom bring separate actions against the railroad. After the railroad wins the first 25 suits, a plaintiff wins in suit 26. Professor Currie argues that offensive use of collateral estoppel should not be applied so as to allow plaintiffs 27 through 50 automatically to recover.

*Parklane,* 439 U.S. at 330 n. 14, 99 S.Ct. at 651 n. 14 (citations omitted). In the present case, AT & T contends that Judge Greene's decision in the Government case, *United States v. AT & T,* 524 F.Supp. 1336, regarding application of the *Noerr-Pennington* doctrine conflicts with the *Litton Noerr-Pennington* verdict.[10]

---

**10.** AT & T also contends that the *Litton* decision conflicts on the *Noerr-Pennington* issue with *Southern Pacific Communications Co. v. AT & T,* 556 F.Supp. 825 (D.D.C.1982), *aff'd* 740 F.2d 1011 (1984), *cert. denied,* 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 380 (1985). The court in *Southern Pacific* found that a speech given by former AT & T Chairman, John deButts, before the FCC announcing AT & T's opposition to certification, is protected by the *Noerr-Pennington* doctrine. *Southern Pacific,* 556 F.Supp. at 894–902, 906–07. This court notes that it is not clear that the *Litton* jury or the Second Circuit made any findings concerning application of the *Noerr-Pennington* doctrine to the deButts speech. *See Litton,* 700 F.2d at 796, 800, 811; *Selectron,* 587 F.Supp. at 865. Given the court's ruling that Judge Greene's *Noerr-Pennington* de-

cision conflicts with *Litton,* however, the court need not decide whether *Southern Pacific* also conflicts with *Litton* on the *Noerr-Pennington* issue.

AT & T also contends that certain "decisions" of the FCC and State regulatory agencies, and a report by the National Academy of Sciences ("NAS"), conflict with the *Litton* finding that AT & T filed the interface tariff in bad faith. Agency findings may be given preclusive effect where the agency acts in a judicial capacity and the party against whom estoppel will be applied had a full and fair opportunity to present its case to the agency. *EZ Loader Boat Trailers, Inc. v. Cox Trailers, Inc.,* 746 F.2d 375, 377–78 (7th Cir.1984). However, the regulatory decisions and report at issue were not the result of

Under the *Noerr-Pennington* Doctrine, "activity within the ambit of the right to petition the government for redress of grievances is privileged under the First Amendment, [and thus immune from antitrust liability,] unless the alleged petitioning activity 'is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of [another].'" *Havoco of America, Ltd. v. Hollobow,* 702 F.2d 643, 649 (7th Cir.1983) (*quoting Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 144, 81 S.Ct. 523, 533, 5 L.Ed.2d 464 (1961)) (citations omitted). Petitioning activity is not a mere sham, even though it incidentally adversely affects the plaintiff's business, and the defendant knew of and even intended such a result, as long as the petitioning activity represents a genuine attempt to influence governmental action. *Havoco,* 702 F.2d at 650.

The *Litton* jury found that AT & T filed its interface tariff with, and opposed certification standards before, the FCC in bad faith. The trial court instructed the jury on the *Noerr-Pennington* defense, but the jury obviously found the defense inapplicable, or found the case to fall within the sham exception. On appeal, AT & T challenged the trial court's *Noerr-Pennington* instructions, contending that the instructions misstated the sham exception and erroneously applied a "preponderance" rather than a "clear and convincing" evidentiary standard. *Litton,* 700 F.2d at 812–14.

The Second Circuit held, after reviewing the jury instructions in their totality, that the instructions "accurately, if in general terms, tracked the Supreme Court's explication of the sham exception in *California Motor Transport [Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609 (1972) ]." *Litton,* 700 F.2d at 813. The Second Circuit also found that the jury instructions essentially comported with its own holding that the *Noerr-Pennington* doctrine does not apply to AT & T's filing of the interface tariff and opposition to certification, and, even if it did, both activities fall within the sham exception.[11] *Id.* at 806–13. Also, the Second Circuit affirmed *Litton's* application of a "preponderance" rather than a "clear and convincing" evidentiary standard for the sham exception. The Second Circuit found that, "by requiring a plaintiff to prove that a defendant's conduct was a sham, the Supreme Court has already struck a rough balance between the competing First Amendment and antitrust issues." *Id.* at 813. Therefore, the court saw no reason to impose the higher "clear and convincing" burden of proof on the antitrust plaintiff asserting the sham exception. *Id.* at 813–14.

In the Government action, AT & T moved to dismiss after the conclusion of the Government's case, pursuant to Fed.R. Civ.P. 41(b). *See supra* p. 6. Judge Greene largely denied the motion, noting that he was not required to grant AT & T's motion to dismiss at that stage of the proceedings, even if under the law he could

---

adversarial proceedings, with all the accouterments of a trial; neither were they based on economic and competitive concerns under principles of antitrust law. *Accord, Glictronix,* 603 F.Supp. at 568–69; *Selectron,* 587 F.Supp. at 865–66. Therefore, the court will not deny estoppel based on the allegedly inconsistent regulatory decisions and report.

**11.** Two judges in the *Litton* appeal found the *Noerr-Pennington* defense inapplicable to AT & T's tariff filing and opposition to certification. *Litton,* 700 F.2d at 806–09. These judges found that AT & T's tariff filing amounted only to "'private commercial activity, no element of which involved seeking to procure the passage or enforcement of laws.'" *Id.* at 807 (*quoting Continental Ore Co. v. Union Carbide and Car-*

*bon Corp.,* 370 U.S. 690, 707, 82 S.Ct. 1404, 1414, 8 L.Ed.2d 777 (1962)). These judges also found that AT & T's opposition to certification, instead of constituting mere advocacy of a position before the FCC, actually constituted an attempt by AT & T to buy as much time as possible to improve its competitive position in the terminal equipment market. *Litton,* 700 F.2d at 809.

All three *Litton* appellate judges found that AT & T's actions fell within the sham exception. *Id.* at 809–12. According to the court, AT & T's consistent and "baseless" claim that the PCA requirement was necessary to protect the telephone network amounted to an abuse of the administrative process and effectively barred other terminal equipment competitors from access to the telephone network system. *Id.*

grant the motion. *United States v. AT & T,* 524 F.Supp. at 1343. Judge Greene explained that Rule 41(b) and the case law permit a judge to decline ruling until the close of all the evidence. *Id.* Judge Greene then stated:

> The decision on the motion to dismiss is a "tentative and inconclusive ruling on the quantum of plaintiff's proof," which does not preclude a court from making findings and conclusions at the close of the case that are inconsistent with its prior tentative ruling.

*Id. (quoting Armour,* 311 F.2d at 494).

Judge Greene went on to discuss, *inter alia,* the application of the *Noerr-Pennington* doctrine to various AT & T activities. *United States v. AT & T,* 524 F.Supp. at 1361–64. Judge Greene held that, with one exception irrelevant to this action, the *Noerr-Pennington* doctrine shields AT & T's "petitioning" activities, including its opposition to certification before the FCC, from antitrust liability.[12] *Id.* at 1363. Judge Greene ordered AT & T to submit to the court a list of Government contentions it considered to be encompassed within the court's acceptance of the *Noerr-Pennington* defense, and granted the Government time to respond. *Id.* at 1364 n. 117. Judge Greene planned to then strike the relevant contentions from the record, but before the court struck any contentions, the case settled.

AT & T contends that Judge Greene's decision is an inconsistent decision, the existence of which renders collateral estoppel on the issues of AT & T's bad faith in filing the interface tariff and opposing certification unfair. General Dynamics contends, however, that Judge Greene's decision does not possess the finality needed to constitute an inconsistent "judgment" or "decision." *See Parklane,* 439 U.S. at 330, 332, 99 S.Ct. at 651, 652.

■ In *Miller Brewing Co. v. Joseph Schlitz Brewing Co.,* 605 F.2d 990, 996 (7th Cir.1979), *cert. denied,* 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980), the Seventh Circuit discussed the requirement that a prior decision finally determine an issue in order to preclude relitigation of that issue. The court adopted the rather broad view of the Second Circuit and the Restatement (Second) of Judgments § 41 that, for purposes of collateral estoppel, a "final judgment" includes any prior adjudication of an issue that is "sufficiently firm" that a court sees no good reason for permitting the parties to relitigate the issue. *Id.* In calculating the "firmness" of the prior adjudication, courts should consider whether the decision was avowedly tentative, whether the hearing was adequate, whether the court supported its decision with a reasoned opinion, and whether the decision was subject to, or in fact reviewed on, appeal. *Id. See also Gilldorn,* at 393 (following *Miller* ); *In Re Cenco Inc. Securities Litigation,* 529 F.Supp. 411, 416 n. 5 (N.D.Ill.1982) (following *Miller* ).[13]

---

**12.** Specifically as to the sham exception, the court found:

> The sham exception ... must be narrowly construed so as not to chill the rights of individuals and corporations to access to courts and to legislative and regulatory bodies. This principle would be hindered by a ruling which exposed an entity to antitrust liability on the basis that an official body found its contentions to be unsupported by the facts or otherwise without merit. To be a sham, the representation must go beyond the normal and legitimate exercises of the right to petition; it must amount to a subversion of the integrity of the process. And, absent special circumstances, this standard is not breached unless there is evidence of a series of misleading statements, of representations having the effect of actually barring access to

an official body, or of an intent to mislead the body concerning central facts. The Court finds that the Bell statements at issue here are not in any of these categories.

*United States v. AT & T,* 524 F.Supp. at 1364.

**13.** *Miller* and its progeny did not concern the finality of alleged inconsistent judgments; rather, they dealt with the finality of decisions upon which parties sought collateral estoppel. The *Faucett* court found that the "finality" required for an inconsistent determination precluding estoppel and that required in order to utilize a case for offensive estoppel are not the same, and that it is enough if the inconsistent judgment "undermines the court's confidence in the underlying decision." *Faucett,* 744 F.2d at 130. The *Glictronix* court, on the other hand, found the finality requirements identical. *Glictronix,*

Applying *Miller* to the instant case, it is clear that Judge Greene's *Noerr-Pennington* decision possesses the finality required to preclude estoppel. Although Judge Greene prefaced his lengthy decision with an acknowledgement that Fed.R.Civ.P. 41 would allow him to amend his decision after AT & T's presentation of evidence, he clearly intended the *Noerr-Pennington* portion of his decision to be final. Obviously, the parties extensively briefed, and Judge Greene gave serious consideration to, AT & T's *Noerr-Pennington* defense. Judge Greene rendered his decision allowing the defense in unequivocal terms after a lengthy discussion. He ordered stricken from the record of the case all of the Government's contentions, not yet identified, encompassed within the *Noerr-Pennington* defense.

■■■ This court therefore finds Judge Greene's *Noerr-Pennington* decision sufficiently final under *Miller* to preclude estoppel on the application of the *Noerr-Pennington* defense.[14] *Accord, Faucett,* 744 F.2d at 129–32; *Glictronix,* 603 F.Supp. at 569–74. This court will not estop AT & T from litigating as to whether its opposition to certification is immune from antitrust liability under the *Noerr-Pennington* doctrine. Furthermore, following *Faucett,* 744 F.2d at 131–32, this court "cannot conclude with certainty that the [*Litton*] jury's finding of AT & T's liability was uninfluenced by evidence that would have been protected under Judge

603 F.Supp. at 573–74. This court need not decide whether the finality requirements are identical or whether less finality is required of an allegedly inconsistent decision, because Judge Greene's *Noerr-Pennington* decision is clearly sufficiently final under *Miller.*

14. Additionally, this court notes that collateral estoppel may apply to questions of law as well as to questions of fact. *Speaker Sortation Systems v. United States Postal Service,* 568 F.2d 46, 49 (7th Cir.1978). *See also Selectron,* 587 F.Supp. at 864 n. 19. This court finds *Litton's* enunciation of the *Noerr-Pennington* doctrine essentially in accord with the Seventh Circuit's position. *Compare Litton,* 700 F.2d at 812–13, with *Havoco,* 702 F.2d at 649–51. However, the court in *Litton,* 700 F.2d at 813, found that a plaintiff must demonstrate the sham exception

Greene's *Noerr-Pennington* formula. Thus, *Parklane Hosiery* teaches that offensive estoppel should not [be] applied to the issue of liability or to any issue that traces therefrom."

### 2. Full and Fair Opportunity to Litigate: Exclusion of the New York Regulatory Decision

■■■ Courts have not clearly specified the source, or defined the content, of the requirement that the first litigation offer a full and fair opportunity to litigate. *Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 481, 102 S.Ct. 1883, 1897 (1982). In the Seventh Circuit, the requirement is couched in general terms: courts must inquire whether application of collateral estoppel will result in a substantial injustice under the particular circumstances of the case. *Butler v. Stover Brothers Trucking Co.,* 546 F.2d 544, 551 (7th Cir.1977). The Supreme Court has identified at least one component of the "full and fair opportunity" requirement. A party has not had a full and fair opportunity to litigate an issue when, "without fault of his own the [party to be estopped] was deprived of crucial evidence or witnesses in the first litigation." *Blonder-Tongue,* 402 U.S. at 333, 91 S.Ct. at 1445.

AT & T contends that it did not have a full and fair opportunity to litigate *Litton* because the trial court excluded a 1969 New York State Public Service Commission decision which upheld AT & T's interface

by a preponderance of evidence, whereas the Seventh Circuit, in *MCI Communications v. AT & T,* 708 F.2d 1081, 1155 (7th Cir.1983), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983), held the plaintiff to the higher "clear and convincing" evidentiary standard. It is well established that changes in the burden of proof may defeat collateral estoppel claims. *Guenther v. Holmgreen,* 738 F.2d 879, 888 (7th Cir.1984), *cert. denied,* 469 U.S. 1212, 105 S.Ct. 1182, 84 L.Ed.2d 329 (1985). *See generally* Wright, Miller and Cooper, *supra,* § 4422 at 214–15. Accordingly, this court finds that granting collateral estoppel effect to the jury finding that AT & T opposed certification in bad faith would inappropriately foreclose relitigation of AT & T's *Noerr-Pennington* defense in this circuit.

requirement as a reasonable means of protecting the telephone network from harm. *New York Telephone Co.*, 79 P.U.R.3d 410 (1969). The Second Circuit, reviewing this evidentiary ruling, found the evidence "arguably probative of AT & T's position," but held that the exclusion did not amount to prejudicial error.[15] *Litton*, 700 F.2d at 819.

AT & T contends that it would have introduced other state regulatory decisions regarding the interface requirement, but it considered the court's exclusion of the New York decision applicable to such decisions. Therefore, AT & T contends that the *Litton* court erroneously prevented it from introducing at trial several state regulatory decisions finding the interface requirement reasonable.[16] AT & T contends that this evidence would demonstrate that it reasonably believed that the interface requirement was in the public interest and might receive the FCC's approval.

In *Faucett*, the court found that the excluded state regulatory decisions could influence the determination of AT & T's alleged liability in a new trial. *Faucett*, 744 F.2d at 126–29. According to the court, "a finding by a state regulatory authority that the interface tariff is necessary to protect AT & T's network may bolster AT & T's claims that its actions were in the public interest." *Id.* at 127. The court found that the Second Circuit's decision that the exclusion amounted to harmless error did not foreclose consideration of the exclusion in a collateral estoppel analysis. The court concluded that, when added to the other obstacles to application of collateral estoppel, the exclusion of the state regulatory decisions would make application of offensive collateral estoppel unfair. *Id.* at 128.

▆ This court finds persuasive, and adopts, the reasoning and holding in *Faucett*. Accord, *Glictronix*, 603 F.Supp. at 574–75. Accordingly, the court denies collateral estoppel effect to the *Litton* jury findings that AT & T filed the interface tariff and opposed certification in bad faith, and all of the other *Litton* jury findings. *Faucett*, 744 F.2d at 128 ("Moreover, we cannot conclude that this evidence, which arguably could shed some light on AT & T's beliefs and intentions, could not lead to a different conclusion in a new trial on the other interrogatories submitted to the jury.").[17]

15. The court specifically held:
 We view this evidence as arguably probative of AT & T's position, and find it difficult to justify the exclusion of this decision in light of the admission of the various FCC rulings. Although there is a considerable difference in cost between the two interface devices, this goes more to the weight to be accorded the evidence than its admissibility; any confusion or prejudice probably could have been avoided by appropriate instructions. But we are also mindful of the fact that this was a complicated and extensive trial, involving four and one-half years of pretrial proceedings, five months of trial, more than 18,000 pages of testimony and 945 exhibits. If a jury trial of this size and complexity is to be had at all, the trial court must have the discretion to limit the evidence at some point. We cannot find that this exclusion amounted to prejudicial error.
 *Litton*, 700 F.2d at 819.

16. The *Faucett* and *Glictronix* courts accepted AT & T's contention that it would have introduced more state regulatory decisions, but the *Litton* trial court's ruling would have applied to, and excluded, such decisions. *Faucett*, 744 F.2d at 127; *Glictronix*, 603 F.Supp. at 574–75.

17. AT & T also contends that it is now prepared to introduce a significant amount of evidence which goes to the heart of the allegations against it in this case. *See Glictronix*, 603 F.Supp. at 575–76; *Selectron*, 587 F.Supp. at 866–67. AT & T asserts that it did not introduce this evidence in *Litton* because some of this evidence came into existence after the *Litton* trial, and the significance of some of this evidence became apparent to AT & T only after the *Litton* trial.

 The *Glictronix* court found that at least a portion of AT & T's new evidence, consisting of the testimony of Walter Hinchman, ex-Chief of the FCC's Common Carrier Bureau, in *Southern Pacific*, 556 F.Supp. 825, casts doubt on the trustworthiness of FCC decisions issued from 1974 through 1978. *Glictronix*, 603 F.Supp. at 575–77. The *Glictronix* court accordingly denied collateral estoppel on the issue of the reasonableness of AT & T's tariff filing and opposition to certification. *Id.* Given this court's ruling with respect to *Litton's* exclusion of the state regulatory decisions, the court need not consider whether the Hinchman testimony is "crucial" evidence which AT & T failed to introduce during *Litton* through no fault of its own.

**1290**

### 3. Underlying Confidence In The Litton Decision

AT & T contends that it would be unfair to preclude it from relitigating issues which the *Litton* jury determined because the *Litton* judgment was based on a false premise. According to AT & T, central to the *Litton* judgment was the premise that, after the *Carterphone* decision, AT & T knew that it could not exclude customer-provided terminal equipment absent a showing of actual harm. AT & T contends that this allegedly false premise served as the basis for the *Litton* finding that AT & T acted in bad faith in filing the interface tariff and opposing certification.

The *Glictronix* court exhaustively addressed this contention, *Glictronix,* 603 F.Supp. at 577–83, concluding that AT & T knew that there was no evidence of harm to the telephone network from interconnection, and that "[i]t was on AT & T's knowledge that its liability in *Litton* could reasonably have been based." *Id.* at 583. This court finds persuasive, and adopts, the reasoning of the *Glictronix* court, and finds that the *Litton* judgment was not based on a demonstrably false premise.

### III. Conclusion

In sum, the court denies General Dynamics' motion to collaterally estop AT & T adversely to AT & T in *Litton,* finding that (1) the issues before the *Litton* jury are not identical to those in the present action; (2) certain issues were not actually litigated in *Litton;* (3) Judge Greene's decision regarding the *Noerr-Pennington* defense conflicts with the *Litton* verdict; and (4) AT & T did not have a full and fair opportunity to litigate in *Litton* because of the exclusion of state regulatory decisions.